IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| | * |
| | *   Criminal Case No.: SAG-21-0286 |
| v. | * |
| | * |
| PHILLIP WASHINGTON, | * |
| | * |
| Defendant. | * |
| | * |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant Phillip Washington is one of two defendants scheduled for trial in a complex narcotics conspiracy case originally charging eleven defendants.[1] At a motions hearing on June 14, 2024, this Court heard argument regarding Mr. Washington's motion to suppress certain statements he made while awaiting processing after arrest. Mr. Washington did not formally file his own motion to suppress statements, instead relying on his motion to adopt motions filed by his co-defendant, Fred Primus.[2] ECF 452. At the motions hearing, this Court afforded Mr. Washington's attorney an opportunity to file written briefing addressing the Government's arguments. This Court has reviewed that briefing, ECF 500, and has considered it along with the evidence and argument adduced at the motions hearing. For the reasons stated below, Mr. Washington's motion to suppress statements will be DENIED.

---

[1] Nine defendants have entered pleas of guilty.

[2] The written briefing in this case, therefore, provides little insight regarding the disposition of this motion. This Court relies on the hearing and on Mr. Washington's post-hearing filing, ECF 500.

**I.     FACTUAL SUMMARY**

On April 29, 2021, in the early morning, officers executed a search warrant at Mr. Washington's home in Windsor Mill, Maryland. One of the officers present in the home administered *Miranda* warnings to Mr. Washington, but he did not undergo interrogation. The officers arrested Mr. Washington after finding contraband in his home and transported him to a nearby police precinct.

Detective Timothy Lee, in his role as the "turnkey" or booking officer at the precinct, is not privy to the reason for an arrestee's arrest, but simply commences the processing for any arrestee who is delivered to the precinct. Once that initial processing is complete, Detective Lee follows the standard procedure of handcuffing one of the arrestee's hands to a rail in the hallway, next to a bench, where the arrestee sits to await the arrival of the arresting officer. The arresting officer, upon arrival, finishes the processing by entering the information about the pending charges into the computer and then taking the arrestee before a court commissioner for an initial appearance.

In accordance with standard procedures, Detective Lee began processing Mr. Washington, conducted a search of Mr. Washington's person, removed any property for safekeeping, and asked Mr. Washington some basic biographical information to begin filling out the charging paperwork. While Mr. Washington was handcuffed to the rail awaiting his arresting officer, he used the bathroom under the supervision of a second "turnkey" officer. Shortly thereafter, the second officer notified Detective Lee that he spotted an item on the floor near the trash can that had not been there before. The two officers watched the surveillance footage and saw Mr. Washington throw the item towards the trash can on his return from the bathroom.

The officers returned to the hallway where Mr. Washington was located and asked him some questions about the item on the floor and where it had come from. They told Mr. Washington that the video had showed him discarding the item, at which point he said that it had been in his shoe. The officers' main concern appeared to be where the item came from (since Mr. Washington and his clothing purportedly had been searched both at the house and in the precinct before the item was discovered) and what the item was. Mr. Washington admitted the item had been in his shoe but claimed it was sugar.

During the entirety of the brief conversation, Mr. Washington remained in the same physical position, handcuffed by one hand to the rail awaiting his arresting officer. Without knowing conclusively what the item was, the officers recovered it from the floor and submitted it for testing. Mr. Washington was not arrested or charged separately for the item on the floor.

## II.  LEGAL STANDARDS

Police must administer *Miranda* warnings when there is "custodial interrogation," defined as "questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Under binding Fourth Circuit precedent, assessing whether a person in a prison setting is "in custody" involves a somewhat counterintuitive analysis. Of course, all incarcerated individuals are technically "in custody," but the Fourth Circuit has declined to find every interaction between officers and an inmate to be "custodial" in nature. Instead, the Fourth Circuit adopted the standard employed by the Ninth Circuit in *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978), which looks to "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart," *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985). Put another way, the Fourth Circuit has explained that the proper inquiry must "be careful to separate

3

the restrictions on [a defendant's] freedom arising from police interrogation and those incident to his background circumstances." *United States v. Jamison*, 509 F.3d 623, 629 (4th Cir. 2007).

### III.   ANALYSIS

For the reasons stated on the record at the motions hearing, this Court rejected the Government's initial contention—that the *Miranda* advisement of Mr. Washington by the searching officers in his home carried over to his later interaction with Detective Lee and his colleague at the precinct. Instead, this Court believes that the appropriate analysis in this case is governed by the line of cases considering interrogation in a prison setting, anchored by *Conley*. *See* 779 F.2d at 973–74.

In that case, after a group of prison inmates left their cells for breakfast, one returned to the cellblock bleeding profusely from knife wounds before he collapsed and died. *Id.* at 971. Prison officials searched the other inmates and discovered Conley with a gouge wound on his wrist. *Id.* They handcuffed Conley and escorted him to a conference room in the prison control center to await transfer to the infirmary for treatment. *Id.* Like all inmates awaiting transfer to the infirmary, Conley wore handcuffs and full restraints when he returned to the control center. *Id.* at 971, 973–74.

While Conley was handcuffed in the conference room, he asked an officer, "What's this all about?" *Id.* at 971. In response, the officer asked Conley how he had been injured. *Id.* Conley maintained that he had observed two inmates attacking the victim and was injured trying to rescue the victim. *Id.* The conversation lasted ten or fifteen minutes. *Id.* When Conley returned from the infirmary, an officer asked him if he was "up to your same old shit again?" and Conley made some additional exculpatory statements about the stabbing incident. *Id.*

When the Government sought to introduce Conley's statements at trial, Conley objected because he had not been advised of his *Miranda* rights. *Id.* at 972. The Fourth Circuit determined that the traditional tests of whether a person is in custody, which turn on "restraint on freedom of movement" or the "freedom to depart" cannot be employed in a prison context. *See id.* at 973 (first quoting *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam); then quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Instead, looking to "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart," the Fourth Circuit concluded that Conley was not. *Id.* Although he was handcuffed and occasionally fully restrained, those were the standard procedures for transporting a prisoner to the infirmary and throughout the facility. The officers testified that they questioned Conley about the incident as a witness, not a suspect, in the murder, and the questioning was brief. Under those facts, the Fourth Circuit concluded that Conley was not in "custody" for purposes of *Miranda* warnings because his "freedom of movement cannot be characterized as more restricted than that of other prisoners" in the same situation. *Id.* at 974.

The Fourth Circuit considered similar issues in *United States v. Jamison*, 509 F.3d 623 (4th Cir. 2007). In that case, Eric Jamison arrived at a hospital emergency room for treatment and told a police officer at the entrance that he had been shot. *Id.* at 625. That report caused officers to interview Jamison at his hospital bed, during which Jamison admitted he had shot himself, leading to charges of possession of a firearm by a convicted felon. *Id.*

At the time of the interview, Jamison was in a hospital bed, connected to an I.V. line, with brown bags placed over his hands to preserve evidence for a gunshot residue test. *Id.* at 626. The police officer examined Jamison's injury (and his clothing) and determined that he had a gunshot wound near his groin but no bullet holes in the exterior of his clothing. *Id.* The officer therefore

5

expressed doubt about Jamison's story that he had been shot by an assailant, causing Jamison to admit that he shot himself with a handgun and threw the gun away. *Id.* The interview lasted about twenty minutes. *Id.* at 627.

The Fourth Circuit reversed the district court's finding that Jamison had been in custody at the time of the interview, finding that the limitations incident to his background circumstances (wearing of a hospital gown, insertion of the I.V. line, and bagging of his hands) constituted Jamison's "background circumstances," not restraints imposed in connection with the interrogation. *Id.* at 629. The Fourth Circuit reasoned that Jamison had initiated the police investigation by reporting the shooting to the officer upon arrival at the hospital and noted that he "would not then be surprised when asked to recount a description of the shooting." *Id.* at 631. When confronted with inconsistent stories, a reasonable person would expect a prudent officer to ask more questions, thus the Court rejected the characterization of the officer's questioning as "aggressive." *Id.* at 632. While acknowledging that all law enforcement questioning has some coercive aspects, the Fourth Circuit noted that "*Miranda* and its progeny do not equate police investigation of criminal acts with police coercion." *Id.* at 631.

This case shares some, but not all, of the features of *Conley* and *Jamison*. Ultimately, it too falls on the "not custodial" side of the dividing line once the Fourth Circuit's standards are employed. At the time of the questioning, Mr. Washington's "background circumstances" include the fact that, like all arrestees, he was handcuffed by one hand to a rail in the precinct awaiting his arresting officer. He was not subject to any additional restraints of any sort once the officers began asking him questions about the discarded item, and he never moved from his seat. Of course, in this situation, unlike in *Conley* and *Jamison*, Mr. Washington started out as the "suspect" in the "investigation" the officers were conducting because they had viewed the video depicting him

6

discarding the item on the floor. That said, this "investigation" was focused primarily on determining how the item had been missed during the search processes and identifying the item itself. The questioning was extremely brief (no more than a few minutes), cannot be described as "aggressive" or "coercive" despite the officers explaining that they had seen Mr. Washington on video, and did not result in any new charges or further investigation of Mr. Washington for the item he dropped. He simply proceeded to be processed, in the ordinary course, for the charges arising from the search warrant at his home. In those circumstances, this Court agrees with the Government that the exchange resembled more of an "on-the-scene" investigation of suspicious activity, despite the identification of Mr. Washington as the suspect, than a custodial investigation. *Miranda* warnings were therefore not required.

## IV. CONCLUSION

For the reasons stated above, this Court finds no constitutional violation in this case and no reason to suppress Mr. Washington's statements. By separate order, this Court will GRANT Mr. Washington's Motion to Adopt All Pertinent Motions Filed by Co-Defendant, ECF 452, but DENY his motion to suppress statements.

Dated: July 2, 2024

                                                   /s/
                                       Stephanie A. Gallagher
                                       United States District Judge